(Slip Opinion)          OCTOBER TERM, 2010          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WILLIAMSON ET AL. *v.* MAZDA MOTOR OF AMERICA, INC., ET AL.

### CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION THREE

No. 08–1314.   Argued November 3, 2010—Decided February 23, 2011

The 1989 version of Federal Motor Vehicle Safety Standard 208 (FMVSS 208) requires, as relevant here, auto manufacturers to install seatbelts on the rear seats of passenger vehicles. They must install lap-and-shoulder belts on seats next to a vehicle's doors or frames, but may install either those belts or simple lap belts on rear inner seats, *e.g.,* those next to a minivan's aisle.

The Williamson family and Thanh Williamson's estate brought this California tort suit, claiming that Thanh died in an accident because the rear aisle seat of the Mazda minivan in which she was riding had a lap belt instead of lap-and-shoulder belts. The state trial court dismissed their claim on the pleadings. The State Court of Appeal affirmed, relying on *Geier* v. *American Honda Motor Co.*, 529 U. S. 861, in which this Court found that an earlier (1984) version of FMVSS 208—which required installation of passive restraint devices—preempted a state tort suit against an auto manufacturer on a failure to install airbags.

*Held:* FMVSS 208 does not pre-empt state tort suits claiming that manufacturers should have installed lap-and-shoulder belts, instead of lap belts, on rear inner seats. Pp. 3–12.

   (a) Because this case involves (1) the same statute as *Geier,* (2) a later version of the same regulation, and (3) a somewhat similar claim that a state tort action conflicts with the federal regulation, the answers to two of the subsidiary questions posed in *Geier* apply directly here. Thus, the statute's express pre-emption clause cannot pre-empt the common-law tort action here; but neither can its saving clause foreclose or limit the operation of ordinary conflict pre-emption principles. The Court consequently turns to *Geier*'s third subsidiary

question*,* whether, in fact, the state tort action conflicts with the federal regulation. Pp. 3–5.

(b) Under ordinary conflict pre-emption principles a state law that "stands as an obstacle to the accomplishment" of a federal law is preempted. *Hines* v. *Davidowitz*, 312 U. S. 52, 67. In *Geier,* the state law stood as an obstacle to the accomplishment of a significant federal regulatory objective, namely, giving manufacturers a choice among different kinds of passive restraint systems. This conclusion was supported by the regulation's history, the agency's contemporaneous explanation, and the Government's current understanding of the regulation. The history showed that the Department of Transportation (DOT) had long thought it important to leave manufacturers with a choice of systems. DOT's contemporaneous explanation of the regulation made clear that manufacturer choice was an important means for achieving DOT's basic objectives. It phased in passive restraint requirements to give manufacturers time to improve airbag technology and develop better systems; it worried that requiring airbags would cause a public backlash; and it was concerned about airbag safety and cost. Finally, the Government's current understanding was that a tort suit insisting upon airbag use would " ' "stan[d] as an obstacle to the accomplishment and execution of these objectives." ' " 529 U. S., at 883. Pp. 5–8.

(c) Like the regulation in *Geier*, the instant regulation leaves the manufacturer with a choice, and the tort suit here would restrict that choice. But in contrast to *Geier,* the choice here is not a significant regulatory objective. The regulation's history resembles the history of airbags to some degree. DOT rejected a regulation requiring lap-and-shoulder belts in rear seats in 1984. But by 1989, changed circumstances led DOT to require manufacturers to install lap-and-shoulder belts for rear outer seats but to retain a manufacturer choice for rear inner seats. Its reasons for doing so differed considerably from its 1984 reasons for permitting a choice of passive restraint. It was not concerned about consumer acceptance; it thought that lap-and-shoulder belts would increase safety and did not pose additional safety risks; and it was not seeking to use the regulation to spur development of alternative safety devices. Instead, DOT thought that the requirement would not be cost effective. That fact alone cannot show that DOT sought to forbid common-law tort suits. For one thing, DOT did not believe that costs would remain frozen. For another, many federal safety regulations embody a cost-effectiveness judgment. To infer pre-emptive intent from the mere existence of such a cost-effectiveness judgment would eliminate the possibility that the agency seeks only to set forth a minimum standard. Finally, the Solicitor General represents that DOT's regulation

Syllabus

does not pre-empt this tort suit.  As in *Geier,* "the agency's own views should make a difference," 529 U. S., at 883, and DOT has not expressed inconsistent views on this subject.  Pp. 8–12.

167 Cal. App. 4th 905, 84 Cal. Rptr. 3d 545, reversed.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, GINSBURG, ALITO, and SOTOMAYOR, JJ., joined.  SOTOMAYOR, J., filed a concurring opinion.  THOMAS, J., filed an opinion concurring in the judgment.  KAGAN, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–1314

DELBERT WILLIAMSON, ET AL., PETITIONERS *v.*
MAZDA MOTOR OF AMERICA, INC., ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION THREE

[February 23, 2011]

JUSTICE BREYER delivered the opinion of the Court.

Federal Motor Vehicle Safety Standard 208 (1989 version) requires, among other things, that auto manufacturers install seatbelts on the rear seats of passenger vehicles. They must install lap-and-shoulder belts on seats next to a vehicle's doors or frames. But they have a choice about what to install on rear inner seats (say, middle seats or those next to a minivan's aisle). There they can install either (1) simple lap belts or (2) lap-and-shoulder belts. 54 Fed. Reg. 46257–46258 (1989); 49 CFR §571.208 (1993), promulgated pursuant to the National Traffic and Motor Vehicle Safety Act of 1966 (Act), 80 Stat. 718, 15 U. S. C. §1381 *et seq.* (1988 ed.) (recodified without substantive change at 49 U. S. C. §30101 *et seq.* (2006 ed.)).

The question presented here is whether this federal regulation pre-empts a state tort suit that, if successful, would deny manufacturers a choice of belts for rear inner seats by imposing tort liability upon those who choose to install a simple lap belt. We conclude that providing manufacturers with this seatbelt choice is not a significant objective of the federal regulation. Consequently, the

regulation does not pre-empt the state tort suit.

## I

In 2002, the Williamson family, riding in their 1993 Mazda minivan, was struck head on by another vehicle. Thanh Williamson was sitting in a rear aisle seat, wearing a lap belt; she died in the accident. Delbert and Alexa Williamson were wearing lap-and-shoulder belts; they survived. They, along with Thanh's estate, subsequently brought this California tort suit against Mazda. They claimed that Mazda should have installed lap-and-shoulder belts on rear aisle seats, and that Thanh died because Mazda equipped her seat with a lap belt instead.

The California trial court dismissed this tort claim on the basis of the pleadings. And the California Court of Appeal affirmed. The appeals court noted that in *Geier* v. *American Honda Motor Co.*, 529 U. S. 861 (2000), this Court considered whether a different portion of (an older version of) Federal Motor Vehicle Safety Standard 208 (FMVSS 208)—a portion that required installation of passive restraint devices—pre-empted a state tort suit that sought to hold an auto manufacturer liable for failure to install a particular kind of passive restraint, namely, airbags. We found that the federal regulation intended to assure manufacturers that they would retain a choice of installing any of several different passive restraint devices. And the regulation sought to assure them that they would not have to exercise this choice in favor of airbags. For that reason we thought that the federal regulation pre-empted a state tort suit that, by premising tort liability on a failure to install airbags, would have deprived the manufacturers of the choice that the federal regulation had assured them. *Id.*, at 874–875.

The court saw considerable similarity between this case and *Geier*. The federal regulation at issue here gives manufacturers a choice among two different kinds of

seatbelts for rear inner seats. And a state lawsuit that premises tort liability on a failure to install a particular kind of seatbelt, namely, lap-and-shoulder belts, would in effect deprive the manufacturer of that choice. The court concluded that, as in *Geier,* the federal regulation pre-empts the state tort suit. 167 Cal. App. 4th 905, 84 Cal. Rptr. 3d 545 (2008).

The Williamsons sought certiorari. And we granted certiorari in light of the fact that several courts have interpreted *Geier* as indicating that FMVSS 208 pre-empts state tort suits claiming that manufacturers should have installed lap-and-shoulder belts, not lap belts, on rear inner seats. *Carden* v. *General Motors Corp.*, 509 F. 3d 227 (CA5 2007); *Roland* v. *General Motors Corp.*, 881 N. E. 2d 722 (Ind. App. 2008); *Heinricher* v. *Volvo Car Corp.*, 61 Mass. App. 313, 809 N. E. 2d 1094 (2004).

II

In *Geier*, we considered a portion of an earlier (1984) version of FMVSS 208. That regulation required manufacturers to equip their vehicles with passive restraint systems, thereby providing occupants with automatic accident protection. 49 Fed. Reg. 28983 (1984). But that regulation also gave manufacturers a choice among several different passive restraint systems, including airbags and automatic seatbelts. *Id.*, at 28996. The question before the Court was whether the Act, together with the regulation, pre-empted a state tort suit that would have held a manufacturer liable for not installing airbags. 529 U. S., at 865. By requiring manufacturers to install airbags (in order to avoid tort liability) the tort suit would have deprived the manufacturers of the choice among passive restraint systems that the federal regulation gave them. See *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S. 707, 713 (1985) ("[S]tate laws can be pre-empted by federal regulations as well as by

federal statutes").

We divided this basic pre-emption question into three subsidiary questions. 529 U. S., at 867. First, we asked whether the statute's *express* pre-emption provision pre-empted the state tort suit. That statutory clause says that "no State" may "establish, or . . . continue in effect . . . *any safety standard* applicable to the same aspect of performance" of a motor vehicle or item of equipment "which is not identical to the Federal standard." 15 U. S. C. §1392(d) (1988 ed.) (emphasis added). We had previously held that a word somewhat similar to "standard," namely, "requirements" (found in a similar statute) included within its scope state "common-law duties," such as duties created by state tort law. *Medtronic, Inc.* v. *Lohr*, 518 U. S. 470, 502–503 (1996) (plurality opinion); *id.*, at 503–505 (BREYER, J., concurring in part and concurring in judgment); *id.*, at 509–512 (O'Connor, J., concurring in part and dissenting in part). But we nonetheless held that the state tort suit in question fell *outside* the scope of this particular pre-emption clause. That is primarily because the statute also contains a saving clause, which says that "[c]ompliance with" a federal safety standard "does not exempt any person *from any liability under common law*." 15 U. S. C. §1397(k) (emphasis added). Since tort law is ordinarily "common law," we held that "the presence of the saving clause," makes clear that Congress intended state tort suits to fall outside the scope of the express pre-emption clause. *Geier*, 529 U. S., at 868.

Second, we asked the converse question: The saving clause *at least* removes tort actions from the scope of the express pre-emption clause. *Id.*, at 869. But does it do more? Does it foreclose or limit "the operation of ordinary pre-emption principles insofar as those principles instruct us to read" federal statutes as pre-empting state laws (including state common-law standards) that "actually conflict" with the federal statutes (or related regulations)?

*Ibid.* (internal quotation marks omitted). We concluded that the saving clause does not foreclose or limit the operation of "ordinary pre-emption principles, grounded in longstanding precedent." *Id.*, at 874.

These two holdings apply directly to the case before us. We here consider (1) the same statute, 15 U. S. C. §1381 *et seq.;* (2) a later version of the same regulation, FMVSS 208; and (3) a somewhat similar claim that a state tort action conflicts with the federal regulation. In light of *Geier,* the statute's express pre-emption clause cannot pre-empt the common-law tort action; but neither can the statute's saving clause foreclose or limit the operation of ordinary conflict pre-emption principles. We consequently turn our attention to *Geier'*s third subsidiary question, whether, in fact, the state tort action conflicts with the federal regulation.

## III

Under ordinary conflict pre-emption principles a state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of a federal law is pre-empted. *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941). See *ibid.* (federal statute can pre-empt a state statute); *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504 (1992) (federal statute can pre-empt a state tort suit); *Fidelity Fed. Sav. & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141 (1982) (federal regulation can pre-empt a state statute); *Geier*, *supra* (federal regulation can pre-empt a state tort suit). In *Geier* we found that the state law stood as an "'obstacle' to the accomplishment" of a significant federal regulatory objective, namely, the maintenance of manufacturer choice. 529 U. S., at 886. We must decide whether the same is true here.

## A

At the heart of *Geier* lies our determination that giving

auto manufacturers a choice among different kinds of passive restraint devices was a *significant objective* of the federal regulation. We reached this conclusion on the basis of our examination of the regulation, including its history, the promulgating agency's contemporaneous explanation of its objectives, and the agency's current views of the regulation's pre-emptive effect.

The history showed that the Department of Transportation (DOT) had long thought it important to leave manufacturers with a choice. In 1967 DOT required manufacturers to install manual seat belts. *Geier*, *supra*, at 875; 32 Fed. Reg. 2408, 2415 (1967). Because many car occupants did not "buckle up," DOT began to require passive protection, such as airbags or automatic seatbelts, but without "favor[ing] or "expect[ing]" the use of airbags. *Geier*, *supra*, at 875 (internal quotation marks omitted); 35 Fed. Reg. 16927 (1970). DOT subsequently approved the use of ignition interlocks, which froze the ignition until the occupant buckled the belt, as a substitute for passive restraints. *Geier*, *supra*, at 876; 37 Fed. Reg. 3911 (1972). But the interlock devices were unpopular with the public, and Congress soon forbade the agency to make them a means of compliance. *Geier*, *supra*, at 876; Motor Vehicle and Schoolbus Safety Amendments of 1974, §109, 88 Stat. 1482 (previously codified at 15 U. S. C. §1410(b) (1988 ed.)). DOT then temporarily switched to the use of demonstration projects, but later it returned to mandating passive restraints, again leaving manufacturers with a choice of systems. *Geier*, *supra*, at 876–877; see 49 Fed. Reg. 28962 (1984).

DOT's contemporaneous explanation of its 1984 regulation made clear that manufacturer choice was an important means for achieving its basic objectives. The 1984 regulation gradually phased in passive restraint requirements, initially requiring manufacturers to equip only 10% of their new fleets with passive restraints. DOT

explained that it intended its phasing period partly to give manufacturers time to improve airbag technology and to develop "other, better" passive restraint systems. *Geier*, 529 U. S., at 879. DOT further explained that it had rejected an "'all airbag'" system. *Ibid.* It was worried that requiring airbags in most or all vehicles would cause a public backlash, like the backlash against interlock devices. *Ibid.* DOT also had concerns about the safety of airbags, for they could injure out-of-place occupants, particularly children. *Id.*, at 877–878. And, given the cost of airbags, vehicle owners might not replace them when necessary, leaving occupants without passive protection. *Ibid.* The regulation therefore "deliberately sought variety—a mix of several different passive restraint systems." *Id.*, at 878. DOT hoped that this mix would lead to better information about the devices' comparative effectiveness and to the eventual development of "alternative, cheaper, and safer passive restraint systems." *Id.*, at 879.

Finally, the Solicitor General told us that a tort suit that insisted upon use of airbags, as opposed to other federally permissible passive restraint systems, would "stan[d] as an obstacle to the accomplishment and execution of these objectives." *Id.*, at 883 (quoting Brief for United States as *Amicus Curiae* in *Geier* v. *American Honda Motor Co.*, O. T. 1999, No. 98–1811, pp. 25–26 (hereinafter United States Brief in *Geier*) (internal quotation marks omitted)). And we gave weight to the Solicitor General's view in light of the fact that it "'embodie[d] the Secretary's policy judgment that safety would best be promoted if manufacturers installed *alternative* protection systems in their fleets rather than one particular system in every car.'" 529 U. S., at 881 (quoting United States Brief in *Geier* 25–26).

Taken together, this history, the agency's contemporaneous explanation, and the Government's current understanding of the regulation convinced us that manufacturer choice was an important regulatory objective. And since

the tort suit stood as an obstacle to the accomplishment of that objective, we found the tort suit pre-empted.

### B

We turn now to the present case. Like the regulation in *Geier*, the regulation here leaves the manufacturer with a choice. And, like the tort suit in *Geier*, the tort suit here would restrict that choice. But unlike *Geier,* we do not believe here that choice is a significant regulatory objective.

We concede that the history of the regulation before us resembles the history of airbags to some degree. In 1984, DOT rejected a regulation that would have required the use of lap-and-shoulder belts in rear seats. 49 Fed. Reg. 15241. Nonetheless, by 1989 when DOT promulgated the present regulation, it had "concluded that several factors had changed." 54 Fed. Reg. 46258.

DOT then required manufacturers to install a particular kind of belt, namely, lap-and-shoulder belts, for rear outer seats. In respect to rear inner seats, it retained manufacturer choice as to which kind of belt to install. But its 1989 reasons for retaining that choice differed considerably from its 1984 reasons for permitting manufacturers a choice in respect to airbags. DOT here was not concerned about consumer acceptance; it was convinced that lap-and-shoulder belts would increase safety; it did not fear additional safety risks arising from use of those belts; it had no interest in assuring a mix of devices; and, though it was concerned about additional costs, that concern was diminishing.

In respect to consumer acceptance, DOT wrote that if

> "people who are familiar with and in the habit of wearing lap/shoulder belts in the front seat find lap/shoulder belts in the rear seat, it stands to reason that they would be more likely to wear those belts when riding in the rear seat." 53 Fed. Reg. 47983

(1988).

In respect to safety, DOT wrote that, because an increasing number of rear seat passengers wore seatbelts, rear seat lap-and-shoulder belts would have "progressively greater actual safety benefits." 54 Fed. Reg. 46257. It added:

> "[s]tudies of occupant protection from 1968 forward show that the lap-only safety belts installed in rear seating positions are effective in reducing the risk of death and injury. . . . However, the agency believes that rear-seat lap/shoulder safety belts would be even more effective." *Ibid.*

Five years earlier, DOT had expressed concern that lap-and-shoulder belts might negatively impact child safety by interfering with the use of certain child car seats that relied upon a tether. But by 1989, DOT found that car-seat designs "had shifted away" from tethers. 53 Fed. Reg. 47983. And rear lap-and-shoulder belts could therefore offer safety benefits for children old enough to use them without diminishing the safety of smaller children in car seats. *Id.*, at 47988–47989 ("[T]he agency believes that this proposal for rear seat lap/shoulder belts would offer benefits for children riding in some types of booster seats, would have no positive or negative effects on children riding in most designs of car seats and children that are too small to use shoulder belts, and would offer older children the same incremental safety protection [as adults]"). Nor did DOT seek to use its regulation to spur the development of alternative kinds of rear aisle or middle seat safety devices. See 54 Fed. Reg. 46257.

Why then did DOT not require lap-and-shoulder belts in these seats? We have found some indication that it thought use of lap-and-shoulder belts in rear aisle seats could cause "entry and exit problems for occupants of seating positions to the rear" by "stretch[ing] the shoulder

belt across the aisleway," *id.*, at 46258. However, DOT encouraged manufacturers to address this issue through innovation:

> "[I]n those cases where manufacturers are able to design and install lap/shoulder belts at seating positions adjacent to aisleways without interfering with the aisleway's purpose of allowing access to more rearward seating positions[, the agency] encourages the manufacturers to do so." 54 Fed. Reg. 46258.

And there is little indication that DOT considered this matter a significant safety concern. Cf. Letter from Philip R. Recht, Chief Counsel, National Highway Traffic Safety Admin., to Roger Matoba (Dec. 28, 1994), App. to Reply Brief for Petitioners 2 ("With respect to your concerns about the safety of shoulder safety belts which cross an aisle, I note that such belts do not in fact prevent rearward passengers from exiting the vehicle. Such passengers may . . . g[o] under or over the belt. They may also move the belt aside").

The more important reason why DOT did not require lap-and-shoulder belts for rear inner seats was that it thought that this requirement would not be cost-effective. The agency explained that it would be significantly more expensive for manufacturers to install lap-and-shoulder belts in rear middle and aisle seats than in seats next to the car doors. *Ibid.* But that fact—the fact that DOT made a negative judgment about cost effectiveness— cannot by itself show that DOT sought to forbid common-law tort suits in which a judge or jury might reach a different conclusion.

For one thing, DOT did not believe that costs would remain frozen. Rather it pointed out that costs were falling as manufacturers were "voluntarily equipping more and more of their vehicles with rear seat lap/shoulder belts." *Ibid.* For another thing, many, perhaps most,

federal safety regulations embody some kind of cost-effectiveness judgment.  While an agency could base a decision to pre-empt on its cost-effectiveness judgment, we are satisfied that the rulemaking record at issue here discloses no such pre-emptive intent.  And to infer from the mere existence of such a cost-effectiveness judgment that the federal agency intends to bar States from imposing stricter standards would treat all such federal standards as if they were *maximum* standards, eliminating the possibility that the federal agency seeks only to set forth a *minimum* standard potentially supplemented through state tort law.  We cannot reconcile this consequence with a statutory saving clause that foresees the likelihood of a continued meaningful role for state tort law.  *Supra*, at 4.

Finally, the Solicitor General tells us that DOT's regulation does not pre-empt this tort suit.  As in *Geier,* "the agency's own views should make a difference."  529 U. S., at 883.

> "Congress has delegated to DOT authority to implement the statute; the subject matter is technical; and the relevant history and background are complex and extensive.  The agency is likely to have a thorough understanding of its own regulation and its objectives and is 'uniquely qualified' to comprehend the likely impact of state requirements."  *Ibid.*

There is "no reason to suspect that the Solicitor General's representation of DOT's views reflects anything other than 'the agency's fair and considered judgment on the matter.'"  *Id.*, at 884 (quoting *Auer* v. *Robbins*, 519 U. S. 452, 462 (1997)).

Neither has DOT expressed inconsistent views on this subject.  In *Geier*, the Solicitor General pointed out that "state tort law does not conflict with a federal 'minimum standard' merely because state law imposes a more stringent requirement."  United States Brief in *Geier* 21 (cita-

tion omitted). And the Solicitor General explained that a standard giving manufacturers "multiple options for the design of" a device would not pre-empt a suit claiming that a manufacturer should have chosen one particular option, where "the Secretary did not determine that the availability of options was necessary to promote safety." *Id.*, at 22; see Brief for United States as *Amicus Curiae* in *Wood* v. *General Motors Corp.*, O. T. 1989, No. 89–46, p. 15. This last statement describes the present case.

In *Geier*, then, the regulation's history, the agency's contemporaneous explanation, and its consistently held interpretive views indicated that the regulation sought to maintain manufacturer choice in order to further significant regulatory objectives. Here, these same considerations indicate the contrary. We consequently conclude that, even though the state tort suit may restrict the manufacturer's choice, it does not "stan[d] as an obstacle to the accomplishment . . . of the full purposes and objectives" of federal law. *Hines*, 312 U. S., at 67. Thus, the regulation does not pre-empt this tort action.

The judgment of the California Court of Appeal is reversed.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–1314

_____

## DELBERT WILLIAMSON, ET AL., PETITIONERS *v.* MAZDA MOTOR OF AMERICA, INC., ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF CALI-
FORNIA, FOURTH APPELLATE DISTRICT, DIVISION THREE

[February 23, 2011]

JUSTICE SOTOMAYOR, concurring.

As the Court notes, this is not the first case in which the Court has encountered the express pre-emption provision and saving clause of the National Traffic and Motor Vehicle Safety Act of 1966, 80 Stat. 718, 15 U. S. C. §1381 *et seq.* (1988 ed.) (recodified without substantive change at 49 U. S. C. §30101 *et seq.* (2006 ed. and Supp. III)). In *Geier* v. *American Honda Motor Co.*, 529 U. S. 861 (2000), the Court concluded that the "saving clause (like the express pre-emption provision) does *not* bar the ordinary working of conflict pre-emption principles," *id.*, at 869, and therefore engaged in an implied pre-emption analysis. The majority and dissent in *Geier* agreed that "a court should not find pre-emption too readily in the absence of clear evidence of a conflict." *Id.,* at 885.

I agree with the majority's resolution of this case and with its reasoning. I write separately only to emphasize the Court's rejection of an overreading of *Geier* that has developed since that opinion was issued.

*Geier* does not stand, as the California Court of Appeal, 167 Cal. App. 4th 905, 918–919, 84 Cal. Rptr. 3d 545, 555–556 (2008), other courts, and some of respondents' *amici* seem to believe, for the proposition that any time an agency gives manufacturers a choice between two or more options, a tort suit that imposes liability on the basis of

one of the options is an obstacle to the achievement of a federal regulatory objective and may be pre-empted.* Rather, *Geier* turned on the fact that the agency, via Federal Motor Vehicle Safety Standard 208, "deliberately sought variety—a mix of several different passive restraint systems." 529 U. S., at 878; *ante*, at 7. As the United States notes, "a conflict results only when the Safety Act (or regulations implementing the Safety Act) does not just set out options for compliance, but also provides that the regulated parties must remain free to choose among those options." Brief for United States as *Amicus Curiae* 8. In other words, the mere fact that an agency regulation allows manufacturers a choice between options is insufficient to justify implied pre-emption; courts should only find pre-emption where evidence exists that an agency has a regulatory objective—*e.g.,* obtaining a mix of passive restraint mechanisms, as in *Geier*—whose achievement depends on manufacturers having a choice between options. A link between a regulatory objective and the need for manufacturer choice to achieve that objective is the lynchpin of implied pre-emption when there is a saving clause.

Absent strong indications from the agency that it needs manufacturers to have options in order to achieve a "significant . . . regulatory objective," *ante*, at 5, state tort suits are not "obstacle[s] to the accomplishment . . . of the full purposes and objectives" of federal law, *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941). As the majority explains, the agency here gave no indication that its safety goals required the mixture of seatbelt types that resulted from manufacturers' ability to choose different options.

————————

*See, *e.g., Carden* v. *General Motors Corp.*, 509 F. 3d 227, 230–232 (CA5 2007); *Griffith* v. *General Motors Corp.*, 303 F. 3d 1276, 1282 (CA11 2002); *Heinricher* v. *Volvo Car Corp.*, 61 Mass. App. 313, 318–319, 809 N. E. 2d 1094, 1098 (2004).

*Ante*, at 8–12 (distinguishing the regulatory record in this case from that in *Geier*).

Especially in light of the "statutory saving clause that foresees the likelihood of a continued meaningful role for state tort law," *ante*, at 11, respondents have not carried their burden of establishing that the agency here "deliberately sought variety" to achieve greater safety, *Geier*, 529 U. S., at 878. Therefore, the Williamsons' tort suit does not present an obstacle to any "significant federal regulatory objective," *ante*, at 5, and may not be pre-empted.

For these reasons, I concur.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–1314

_____

## DELBERT WILLIAMSON, ET AL., PETITIONERS *v.* MAZDA MOTOR OF AMERICA, INC., ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF CALI-
FORNIA, FOURTH APPELLATE DISTRICT, DIVISION THREE

[February 23, 2011]

JUSTICE THOMAS, concurring in the judgment.

The Court concludes that the National Traffic and Mo-
tor Vehicle Safety Act of 1966 (Safety Act) and Federal
Motor Vehicle Safety Standard 208 (FMVSS 208) do not
pre-empt the Williamsons' state tort lawsuit.  I agree.  But
I reach this result by a more direct route: the Safety Act's
saving clause, which speaks directly to this question and
answers it.  See 49 U. S. C. §30103(e).

### I

The plain text of the Safety Act resolves this case.
Congress has instructed that "[c]ompliance with a motor
vehicle safety standard prescribed under this chapter does
not exempt a person from liability at common law." *Ibid.*
This saving clause "explicitly preserv[es] state common-
law actions." *Wyeth* v. *Levine*, 555 U. S. \_\_\_, \_\_\_ (2009)
(THOMAS, J., concurring in judgment) (slip op., at 18).
Here, Mazda complied with FMVSS 208 when it chose to
install a simple lap belt.  According to Mazda, the Wil-
liamsons' lawsuit alleging that it should have installed a
lap-and-shoulder seatbelt instead is pre-empted.  That
argument is foreclosed by the saving clause; the William-
sons' state tort action is not pre-empted.

The majority does not rely on the Safety Act's saving
clause because this Court effectively read it out of the

statute in *Geier* v. *American Honda Motor Co.*, 529 U. S. 861 (2000). In *Geier*, the Court interpreted the saving clause as simply cancelling out the statute's express pre-emption clause with respect to common-law tort actions. This left the Court free to consider the effect of conflict pre-emption principles on such tort actions. See *id.,* at 869.

But it makes no sense to read the express pre-emption clause in conjunction with the saving clause. See *id.,* at 898 (Stevens, J., dissenting). The express pre-emption clause bars States from having any safety "standard applicable to the same aspect of performance" as a federal standard unless it is "identical" to the federal one. §30103(b). That clause pre-empts States from establishing "objective rule[s] prescribed by a legislature or an administrative agency" in competition with the federal standards; it says nothing about the tort lawsuits that are the focus of the saving clause. *Id.,* at 896.* Read independently of the express pre-emption clause, the saving clause simply means what it says: FMVSS 208 does not pre-empt state common-law actions.

## II

As in *Geier*, rather than following the plain text of the statute, the majority's analysis turns on whether the tort lawsuit here "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives'" of FMVSS 208. *Ante*, at 5 (quoting *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941)). I have rejected purposes-and-objectives pre-emption as inconsistent with the Constitu-

—————

* See also *Sprietsma* v. *Mercury Marine*, 537 U. S. 51, 63–64 (2002) (addressing a similar express pre-emption clause and saving clause in the Federal Boat Safety Act, and holding that it is "perfectly rational" for Congress to bar state "administrative and legislative regulations" while allowing "private damages remedies" to compensate accident victims).

tion because it turns entirely on extratextual "judicial suppositions." *Wyeth, supra,* at ___ (slip op., at 22); see also *Haywood* v. *Drown*, 556 U. S. ___, ___ (2009) (dissenting opinion) (slip op., at 26–27).

Pre-emption occurs "by direct operation of the Supremacy Clause," *Brown* v. *Hotel Employees*, 468 U. S. 491, 501 (1984), which "requires that pre-emptive effect be given only to those federal standards and policies that are set forth in, or necessarily follow from, the statutory text that was produced through the constitutionally required bicameral and presentment procedures." *Wyeth*, 555 U. S., at ___ (slip op., at 5) (opinion of THOMAS, J.). In short, pre-emption must turn on the text of a federal statute or the regulations it authorizes. See *id.,* at ___ (slip op., at 6); see also *Geier, supra,* at 911 (Stevens, J., dissenting).

Purposes-and-objectives pre-emption—which by design roams beyond statutory or regulatory text—is thus wholly illegitimate. It instructs courts to pre-empt state laws based on judges' "conceptions of a policy which Congress has not expressed and which is not plainly to be inferred from the legislation which it has enacted." *Hines, supra,* at 75 (Stone, J., dissenting); *Geier, supra,* at 907 (opinion of Stevens, J.) (expressing concern about judges "running amok with our potentially boundless (and perhaps inadequately considered) [purposes-and-objectives pre-emption doctrine]"); see also *Wyeth, supra,* at ___ (slip op., at 13–21) (opinion of THOMAS, J.) (recounting the history of the doctrine).

The majority's purposes-and-objectives pre-emption analysis displays the inherent constitutional problem with the doctrine. The Court begins with FMVSS 208, which allowed manufacturers to install either simple lap or lap-and-shoulder seatbelts in the rear aisle seat of 1993 minivans. The majority then turns to what it considers the primary issue: whether "that choice [was] a *significant* regulatory objective." *Ante*, at 8 (emphasis added). Put

more plainly, the question is whether the regulators *really* wanted manufacturers to have a choice or did not really want them to have a choice but gave them one anyway.

To answer that question, the majority engages in a "freewheeling, extratextual, and broad evaluatio[n] of the 'purposes and objectives'" of FMVSS 208. *Wyeth*, *supra,* at ___ (slip op., at 23) (opinion of THOMAS, J.). The Court wades into a sea of agency musings and Government litigating positions and fishes for what the agency may have been thinking 20 years ago when it drafted the relevant provision. After scrutinizing the 1989 Federal Register, a letter written in 1994, and the Solicitor General's present-day assurances, the Court finds that Department of Transportation liked the idea of lap-and-shoulder seatbelts in all seats, but did not require them, primarily for cost-efficiency reasons and also because of some concern for ingress-egress around the belt mounts. *Ante*, at 8–11. From all of this, the majority determines that although the regulators specifically and intentionally gave manufacturers a choice between types of seatbelts, that choice was not a "significant regulatory objective" and so does not pre-empt state tort lawsuits.

That the Court in *Geier* reached an opposite conclusion reveals the utterly unconstrained nature of purposes-and-objectives pre-emption. There is certainly "considerable similarity between this case and *Geier*." *Ante*, at 2. Just as in this case, *Geier* involved a choice offered to car manufacturers in FMVSS 208: whether to install airbags. *Ante*, at 8. And just as in this case, the Court in *Geier* relied on "history, the agency's contemporaneous explanation, and the Government's current understanding" to determine the significance of that choice. *Ante*, at 7–8. Yet the *Geier* Court concluded that "giving auto manufacturers a choice among different kinds of passive restraint devices was a *significant objective* of the federal regulation," *ante*, at 6, and thus found the Geiers' lawsuit pre-

empted.

The dispositive difference between this case and *Geier*—indeed, the only difference—is the majority's "psycho-analysis" of the regulators. *United States* v. *Public Util. Comm'n of Cal.*, 345 U. S. 295, 319 (1953) (Jackson, J., concurring) (describing reliance on legislative history). The majority cites no difference on the face of FMVSS 208 between the airbag choice addressed in *Geier* and the seatbelt choice at issue in this case.

According to the majority, to determine whether FMVSS 208 pre-empts a tort suit, courts apparently must embark on the same expedition undertaken here: sifting through the Federal Register, examining agency ruminations, and asking the Government what it currently thinks. Pre-emption is then proper if the court decides that the regulators thought the choice especially important, but not if the choice was only somewhat important. This quest roves far from the Safety Act and analyzes pre-emption based on a formless inquiry into how strongly an agency felt about the regulation it enacted 20 years ago.

"[F]reeranging speculation about what the purposes of the [regulation] must have been" is not constitutionally proper in any case. *Wyeth*, *supra,* at \_\_\_ (slip op., at 15) (opinion of THOMAS, J.). The Supremacy Clause commands that the "[l]aws of the United States," not the unenacted hopes and dreams of the Department of Transportation, "shall be the supreme Law of the Land." U. S. Const., Art. VI, cl. 2. The impropriety is even more obvious here because the plain text of the Safety Act resolves this case.

For these reasons, I concur in the judgment.