Justice Sotomayor,
dissenting.
In enacting the Immigration Reform and Control Act of 1986 (IRCA), 100 Stat. 3359, Congress created a “comprehensive scheme prohibiting the employment of illegal aliens in the United States.” Hoffman Plastic Compounds, Inc. v. NLRB, 535 U. S. 137, 147 (2002). The Court reads IRCA’s saving clause — which preserves from pre-emption state “licensing and similar laws,” 8 U. S. C. § 1324a(h)(2) — to permit States to determine for themselves whether someone has employed an unauthorized alien so long as they do so in conjunction with licensing sanctions. This reading of the saving clause cannot be reconciled with the rest of IRCA’s comprehensive scheme. Having constructed a federal mechanism for determining whether someone has knowingly employed an unauthorized alien, and having withheld from the States the information necessary to make that determination, Congress could not plausibly have intended for the saving clause to operate in the way the majority reads it to do. When viewed in context, the saving clause can only be *631 understood to preserve States’ authority to impose licensing sanctions after a final federal determination that a person has violated IECA by knowingly employing an unauthorized alien. Because the Legal Arizona Workers Act instead creates a separate state mechanism for Arizona state courts to determine whether a person has employed an unauthorized alien, I would hold that it falls outside the saving clause and is pre-empted.
I would also hold that federal law pre-empts the provision of the Arizona Act making mandatory the use of E-Verify, the federal electronic verification system. By requiring Arizona employers to use E-Verify, Arizona has effectively made a decision for Congress regarding use of a federal resource, in contravention of the significant policy objectives motivating Congress’ decision to make participation in the E-Verify program voluntary.
I
A
I begin with the plain text of IRCA’s pre-emption clause. IRCA expressly pre-empts States from “imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.”[1] Ibid. The Arizona Act, all agree, imposes civil sanctions upon those who employ unauthorized aliens. The Act thus escapes express preemption only if it falls within IRCA’s parenthetical saving clause for “licensing and similar laws.” Ibid.
The saving clause is hardly a paragon of textual clarity. IRCA does not define “licensing,” nor does it use the word “licensing” in any other provision. Laws that impose sanc *632 tions by means of licensing exist in many forms. Some permit authorities to take action with respect to licenses upon finding that a licensee has engaged in prohibited conduct. See, e. g., Ariz. Rev. Stat. Ann. § 4-210(A)(l) (West 2011) (liquor licenses may be suspended or revoked if the licensing authority determines after notice and a hearing that repeated acts of violence have occurred on the licensed premises). Others, more narrowly, permit authorities to take such action following a pre-existing determination by another authorized body that the licensee has violated another provision of law. See, e. g., § 4-202(D) (liquor licenses may not be renewed to persons who have been convicted of felonies within the past five years). That both types of laws might be defined in some contexts as licensing laws does not necessarily mean that Congress intended the saving clause to encompass both types. See Dolan v. Postal Service, 546 U. S. 481, 486 (2006) (“A word in a statute may or may not extend to the outer limits of its definitional possibilities”); see also FCC v. AT&T Inc., 562 U. S. 397, 407 (2011) (“[C]onstruing statutory language is not merely an exercise in ascertaining the outer limits of [a word’s] definitional possibilities” (internal quotation marks omitted; second alteration in original)). In isolation, the text of IRCA’s saving clause provides no hint as to which type or types of licensing laws Congress had in mind.
B
Because the plain text of the saving clause does not resolve the question, it is necessary to look to the text of IRCA as a whole to illuminate Congress’ intent. See Dolan, 546 U. S., at 486 (“Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute”); Ali v. Federal Bureau of Prisons, 552 U. S. 214, 222 (2008) (construction of a statutory term “must, to the extent possible, ensure that the statutory scheme is coherent and consistent”); Davis v. Michigan Dept. of Treasury, 489 U. S. 803, 809 (1989) (“[St]tatutory language *633 cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme”).[2]
Before Congress enacted IRCA in 1986, a number of States had enacted legislation prohibiting employment of unauthorized aliens. See ante, at 688, and n. 1 (citing 11 such laws). California, for example, prohibited the knowing employment of an alien “who is not entitled to lawful residence in the United States” when “such employment would have an adverse effect on lawful resident workers,” and made violations punishable by fines of $200 to $500. 1971 Cal. Stats, ch. 1442, § 1; see also De Canas v. Bica, 424 U. S. 351, 352, n. 1 (1976). Kansas went even further, making it a misdemeanor, punishable by a term of confinement not to exceed one month, to employ a person within Kansas knowing “such person to be illegally within the territory of the United States.” Kan. Stat. Ann. §§21-4409, 21-4502 (1981).[3]
Congress enacted IRCA amidst this patchwork of state laws. IRCA “ ‘forcefully’ made combating the employment of illegal aliens central to ‘the policy of immigration law.’ ” Hoffman, 535 U. S., at 147 (quoting INS v. National Center for Immigrants’ Rights, Inc., 502 U. S. 183, 194, and n. 8 (1991); brackets omitted); see also H. R. Rep. No. 99-682, pt. 1, p. 46 (1986) (“[L]egislation containing employer sanctions is the most humane, credible and effective way to respond to the large-scale influx of undocumented aliens”). As the *634 majority explains, IRCA makes it “unlawful for a person or other entity ... to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien." § 1324a(a)(l)(A); ante, at 588-589. IRCA also requires employers to verify that they have reviewed documents establishing an employee’s eligibility for employment. See § 1324a(b); ante, at 589. These two provisions are the foundation of IRCA’s “comprehensive scheme prohibiting the employment of illegal aliens in the United States.” Hoffman, 535 U. S., at 147.
Congress made explicit its intent that IRCA be enforced uniformly. IRCA declares that “[i]t is the sense of the Congress that . . . the immigration laws of the United States should be enforced vigorously and uniformly.” §115, 100 Stat. 3384 (emphasis added). Congress structured IRCA’s provisions in a number of ways to accomplish this goal of uniform enforcement.
First, and most obviously, Congress expressly displaced the myriad state laws that imposed civil and criminal sanctions on employers who hired unauthorized aliens. See § 1324a(h)(2); see also H. R. Rep. No. 99-682, at 58 (“The penalties contained in this legislation are intended to specifically preempt any state or local laws providing civil fines and/or criminal sanctions on the hiring, recruitment or referral of undocumented aliens”). Congress could not have made its intent to pre-empt state and local laws imposing civil or criminal sanctions any more “ ‘clear [or] manifest.’ ” Medtronic, Inc. v. Lohr, 518 U. S. 470, 485 (1996) (quoting Rice v. Santa Fe Elevator Corp., 331 U. S. 218, 230 (1947)).
Second, Congress centralized in the Federal Government enforcement of IRCA’s prohibition on the knowing employment of unauthorized aliens. IRCA instructs the Attorney General to designate a specialized federal agency unit whose “primary duty” will be to prosecute violations of IRCA. § 1324a(e)(l)(D). IRCA also instructs the Attorney General to establish procedures for receiving complaints, investigat *635 ing complaints having “a substantial probability of validity,” and investigating other violations. § 1324a(e)(l); see also 8 CFR §274a.9 (2010). Upon concluding that a person has violated IRCA, the Attorney General must provide the person with notice and an opportunity for a hearing before a federal administrative law judge (ALJ). 8 U. S. C. §§ 1324a(e) (3)(A), (B). If the person does not request a hearing, the Attorney General may impose a final, nonappealable order requiring payment of sanctions. § 1324a(e)(3)(B). If the person requests a hearing, the ALJ is required to hold a hearing and, upon finding that the person has violated IRCA, must order the payment of sanctions. § 1324a(e)(3)(C). The ALJ’s order is the final agency order, unless the affected person requests and obtains further administrative appellate review. § 1324a(e)(7); see also 28 CFR § 68.54 (2010). IRCA grants immigration officers and ALJs “reasonable access to examine evidence of any person or entity being investigated” and provides them with extensive subpoena powers. § 1324a(e)(2). And the immigration officers investigating suspected violations obviously have access to the relevant federal information concerning the work authorization status of the employee in question.[4]
Third, Congress provided persons “adversely affected” by an agency order with a right of review in the federal courts of appeals. § 1324a(e)(8); see also § 1324a(e)(9) (directing the Attorney General in eases of noncompliance to file suit in federal district court to enforce a final order imposing sanctions); § 1324a(f) (authorizing the Attorney General to pursue injunctive relief and criminal sanctions in federal district court). In this way, Congress ensured that administrative orders finding violations of IRCA would be reviewed by federal judges with experience adjudicating immigration-related matters.
*636 Fourth, Congress created a uniquely federal system by which employers must verify the work authorization status of new hires. Under this system, an employer must attest under penalty of perjury on a form designated by the Attorney General (the 1-9 form) that it has examined enumerated identification documents to verify that a new hire is not an unauthorized alien. § 1324a(b)(l)(A); see also 8 CFR § 274a.2; ante, at 589. Good-faith compliance with this verification requirement entitles an employer to an affirmative defense if charged with violating IRCA. § 1324a(a)(3); see also H. R. Rep. No. 99-682, at 57. Notably, however, IRCA prohibits use of the 1-9 form for any purpose other than enforcement of IRCA and various provisions of federal criminal law. § 1324a(b)(5); 8 CFR § 274a.2(b)(4). Use of the 1-9 form is thus limited to federal proceedings, as the plurality acknowledges. See ante, at 603, n. 9.
Finally, Congress created no mechanism for States to access information regarding an alien’s work authorization status for purposes of enforcing state prohibitions on the employment of unauthorized aliens. The relevant sections of IRCA make no provision for the sharing of work authorization information between federal and state authorities even though access to that information would be critical to a State’s ability to determine whether an employer has employed an unauthorized alien. In stark contrast, a separate provision in the same title of IRCA creates a verification system by which States can ascertain the immigration status of aliens applying for benefits under programs such as Medicaid and the food stamp program. See IRCA § 121(a)(1)(C), 42 U. S. C. § 1320b-7(d)(3). The existence of a verification system in one provision of IRCA, coupled with its absence in the provision governing employment of unauthorized aliens, suggests strongly that Congress did not contemplate any role for the States in adjudicating questions regarding employment of unauthorized aliens. Cf. Bates v. United States, 522 U. S. 23, 29-30 (1997) (“Where Congress includes particu *637 lar language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion” (internal quotation marks and brackets omitted)).
In an attempt to show that Congress intended for the Federal Government to share immigration-related information with the States, Arizona points to a federal statute, 8 U. S. C. § 1373(c), requiring the Government to respond to certain inquiries from state agencies. Section 1373(c), however, merely requires the Government to respond to inquiries from state agencies “seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency.” It does not require the provision of information regarding an alien’s work authorization status, which is not necessarily synonymous with immigration status. See 8 CFR § 274a.l2(c) (identifying categories of legal aliens “who must apply for employment authorization”).[5] Arizona has not identified any federal statute or regulation requiring the Federal Government to provide information regarding an alien’s work authorization status to a State.[6] More importantly, § 1373(c) was enacted in 1996, see § 642(c), 110 Stat. 3009-707, and thus says nothing about Congress’ intent when it enacted IRCA’s saving clause a decade earlier. See Jones v. United States, 526 U. S. 227, 238 (1999).
Collectively, these provisions demonstrate' Congress’ intent to build a centralized, exclusively federal scheme for determining whether a person has “employ[ed], or reeruit[ed] *638 or referred] for a fee for employment, unauthorized aliens.” 8U.S.C. §1324a(h)(2).
C
IRCA’s saving clause must be construed against this backdrop. Focusing primarily on the text of the saving clause, Arizona and the majority read the clause to permit States to determine themselves whether a person has employed an unauthorized alien, so long as they do so in connection with licensing sanctions. See ante, at 597-599. This interpretation overlooks the broader statutory context and renders the statutory scheme “[in]coherent and [in]consistent.” Ali, 552 U. S., at 222.
Under the majority’s reading of the saving clause, state prosecutors decide whether to commence licensing-related proceedings against a person suspected of employing an unauthorized alien. The majority’s holding also permits state courts and other tribunals to adjudicate the question whether an employer has employed an unauthorized alien. The Arizona Act illustrates the problems with reading the saving clause to permit such state action. The Act directs prosecutors to verify an employee’s work authorization with the Federal Government pursuant to § 1373(c), e.g., Ariz. Rev. Stat. Ann. § 23-212(B) (West Supp. 2010), and the state court “shall consider only the federal government’s determination pursuant to [§] 1373(c)” in “determining whether an employee is an unauthorized alien,” e. g., § 23-212(H).[7] Putting aside the question whether § 1373(c) actually provides access to work authorization information, § 1373(c) did not exist when IRCA was enacted in 1986. See supra, at 637. Arizona has not identified any avenue by which States could have accessed work authorization information in the first decade of IRCA’s existence. The absence of any such avenue at the time of IRCA’s enactment speaks volumes as to *639 how Congress would have understood the saving clause to operate: If States had no access to information regarding the work authorization status of aliens, how could state courts have accurately adjudicated the question whether an employer had employed an unauthorized alien?
The Arizona Act’s reliance on § 1373(c) highlights the anomalies inherent in state schemes that purport to adjudicate whether an employee is an authorized alien. Even when Arizona prosecutors obtain information regarding an alien’s immigration status pursuant to § 1373(c), the prosecutors and state court will have to determine the significance of that information to an alien's work authorization status, which will often require deciding technical questions of immigration law. See, e.g., 8 CFR §§274a.l2(a)-(c) (dividing 62 different classes of aliens into those authorized for employment incident to immigration status, those authorized for employment with a specific employer incident to immigration status, and those who must apply for work authorization). And, as discussed above, that information may not shed light at all on an alien’s work authorization status, which is oftentimes distinct from immigration status. See supra, at 637, and n. 5. As a result, in many cases state decisions — made by prosecutors and courts with no or little experience in federal immigration law — will rest on less-than-complete or inaccurate information, “ereat[ing] enforcement risks not present in the federal system.” Ante, at 617 (Breyer, J., dissenting). I can discern no reason why Congress would have intended for state courts inexperienced in immigration matters to adjudicate, in the context of licensing sanctions, the very same question that IRC A commits to federal officers, ALJs, and the courts of appeals.
Equally problematic is the fact that employers charged under a state enforcement scheme with hiring unauthorized aliens are foreclosed from using 1-9 forms in their defense in the state proceedings. Like IRCA, the Arizona Act con *640 fers an affirmative defense on employers who comply in good faith with IRCA’s verification requirement. See Ariz. Rev. Stat. Ann. §§23-212(J), 23-212.01(J). As discussed above, however, IRCA prohibits an employer from using the 1-9 form to establish that affirmative defense under Arizona law. See 8 U.S.C. § 1324a(b)(5); 8 CFR § 274a.2(b)(4). Not to worry, the plurality says: The employer can establish the affirmative defense through office policies and testimony of employees. Ante, at 603, n. 9. But Congress made the 1-9 verification system and accompanying good-faith defense central to IRCA. See, e.g., H. R. Rep. No. 99-682, at 60 (“[A]n effective verification procedure, combined with an affirmative defense for those who in good faith follow the procedure, is essential”). Given the importance of this procedure, if Congress in fact intended for state courts to adjudicate whether a person had employed an unauthorized alien in connection with licensing sanctions, why would it have prohibited that person from using the 1-9 form — “the employer’s most effective evidence,” ante, at 619 (Breyer, J., dissenting) — in the state-court proceeding? The question answers itself: Congress intended no such thing.
Furthermore, given Congress’ express goal of “umfor[m]” enforcement of “the immigration laws of the United States,” IRCA § 115, 100 Stat. 3384, I cannot believe that Congress intended for the 50 States and countless localities to implement their own distinct enforcement and adjudication procedures for deciding whether employers have employed unauthorized aliens. Reading the saving clause as the majority does subjects employers to a patchwork of enforcement schemes similar to the one that Congress sought to displace when it enacted IRCA. Having carefully constructed a uniform federal scheme for determining whether a person has employed an unauthorized alien, Congress could not plausibly have meant to create such a gaping hole in that scheme through the undefined, parenthetical phrase “licensing and similar laws.” See Whitman v. American Trucking Assns., *641 Inc., 531 U. S. 457, 468 (2001) (“Congress . . . does not, one might say, hide elephants in mouseholes”).
In sum, the statutory scheme as a whole defeats Arizona’s and the majority’s reading of the saving clause. Congress would not sensibly have permitted States to determine for themselves whether a person has employed an unauthorized alien, while at the same time creating a specialized federal procedure for making such a determination, withholding from the States the information necessary to make such a determination, and precluding use of the 1-9 forms in nonfederal proceedings. See United States v. Locke, 529 U. S. 89, 106 (2000) (“We decline to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law”).
To render IRCA’s saving clause consistent with the statutory scheme, I read the saving clause to permit States to impose licensing sanctions following a final federal determination that a person has violated § 1324a(a)(l)(A) by knowingly hiring, recruiting, or referring for a fee an unauthorized alien.[8] This interpretation both is faithful to the saving *642 clause's text, see supra, at 631-632, and best reconciles the saving clause with IRCA’s “careful regulatory scheme,” Locke, 529 U. S., at 106. It also makes sense as a practical matter. In enacting IRCA’s pre-emption clause, Congress vested in the Federal Government the authority to impose civil and criminal sanctions on persons who employ unauthorized aliens. Licensing and other types of business-related permissions are typically a matter of state law, however. See, e. g., Kamen v. Kemper Financial Services, Inc., 500 U. S. 90, 98 (1991) (noting that “[corporation law” is an area traditionally “governed by state-law standards”); Chicago Title & Trust Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp., 302 U. S. 120, 127 (1937) (“How long and upon what terms a state-created corporation may continue to exist is a matter exclusively of state power”). As a result, if Congress wanted to “ensurfe] that a full range of. sanctions [was] available to be used against businesses that employ unauthorized aliens,” Brief for Respondents 37, Congress had to authorize the States and localities to impose licensing sanctions following a federal adjudication of a violation of IRCA.
I do not mean to suggest that the mere existence of a comprehensive federal scheme necessarily reveals a congressional intent to oust state remedies. Cf. English v. General Elec. Co., 496 U. S. 72, 87 (1990) (“[T]he mere existence of a federal regulatory or enforcement scheme . . . does not by itself imply pre-emption of state remedies”); New York State Dept. of Social Servs. v. Dublino, 413 U. S. 405, 415 (1973) (rejecting the argument that “pre-emption is to be inferred merely from the comprehensive character of the federal [program]”). Here, Congress has made clear its intent to oust *643 State civil and criminal remedies; the sole question is the scope of the saving clause’s exception for “licensing and similar laws.” The comprehensive scheme established by Congress necessarily informs the scope of this clause. For all the reasons stated, the only interpretation of that clause that is consistent with the rest of the statute is that it preserves the States’ authority to impose licensing sanctions after a final federal determination that a person has violated IRCA’s prohibition on the knowing employment of unauthorized aliens.
Under my construction of the saving clause, the Arizona Act cannot escape pre-emption. The Act authorizes Arizona county attorneys to commence actions charging an employer with having employed an unauthorized alien. Ariz. Rev. Stat. Ann. §§ 28-212(D), 23-212.01(D). Arizona state courts must find that an employer has employed an unauthorized alien before imposing the sanctions enumerated in the Act. §§23-212(F), 23-212.01(F). Because the Act’s sanctions are not premised on a final federal determination that an employer has violated IRCA, I would hold that the Aet does not fall within IRCA’s saving clause and is therefore pre-empted.[9]
II
I agree with the conclusion reached by Justice Breyer in Part IV of his dissenting opinion that federal law impliedly pre-empts the provision in the Arizona Act requiring all Arizona employers to use the federal E-Verify program. See Ariz. Rev. Stat. Ann. §23-214. I also agree with much of his reasoning. I write separately to offer a few additional observations.
As we have recently recognized, that a state law makes mandatory something that federal law makes voluntary does *644 not mean, in and of itself, that the state law “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,” Crosby v. National Foreign Trade Council, 530 U. S. 363,373 (2000) (internal quotation marks omitted). See Williamson v. Mazda Motor of America, Inc., 562 U. S. 323, 326 (2011) (concluding that a federal regulation permitting manufacturers to choose between two seatbelt options did not pre-empt state tort liability based on a decision to install one of those options); see also id., at 337 (Sotomayor, J., concurring) (“[T]he mere fact that an agency regulation allows manufacturers a choice between options is insufficient to justify implied pre-emption”).
This case, however, is readily distinguishable from cases like Williamson, in which state law regulates relationships between private parties. Here, the Arizona Act directly regulates the relationship between the Federal Government and private parties by mandating use of a federally created and administered resource. This case thus implicates the “uniquely federal interes[t]” in managing use of a federal resource. Boyle v. United Technologies Corp., 487 U. S. 500, 504 (1988) (internal quotation marks omitted); see also Buckman Co. v. Plaintiffs’ Legal Comm., 531 U. S. 341, 347 (2001) (“[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law”).
Significant policy objectives motivated Congress’ decision to make use of E-Verify voluntary. In addition to those discussed by Justice Breyer, see ante, at 627-628 (dissenting opinion), I note that Congress considered the cost of a mandatory program. In 2003, when Congress elected to expand E-Verify to all 50 States but declined to require its use, it cited a congressionally mandated report concluding that the annual cost of the pilot program was $6 million, the annual cost of a nationwide voluntary program would be $11 million, and the annual cost of a nationwide mandatory program *645 would be $11.7 billion. H. R. Rep. No. 108-304, pt. 1, p. 6 (2003); see also Institute for Survey Research, Temple Univ., and Westat, INS Basic Pilot Evaluation: Summary Report 38 (2002) (concluding that the Social Security Administration (SSA) and the Immigration and Naturalization Service were not “capable of enrolling and administering a program for the hundreds of thousands of employers in any of the large mandatory programs explored here”). A more recent report prepared for the Department of Homeland Security similarly noted the costs associated with mandatory use of E-Verify. See Westat, Findings of the E-Verify® Program Evaluation 224 (Dec. 2009) (observing that the SSA estimated that it would have to hire an additional 1,500 field staff to handle a mandatory national program); id., at 251 (recommending that any expansion of E-Verify take place gradually “to allow the Federal government adequate time to hire and train the new staff required to run such a program”). Permitting States to make use of E-Verify mandatory improperly puts States in the position of making decisions for the Federal Government that directly affect expenditure and depletion of federal resources.[10]
The majority highlights the Government’s statement in its amicus brief that “ 'the E-Verify system can accommodate the increased use that the Arizona statute and existing similar laws would create.’” Ante, at 610 (quoting Brief for United States 34). But “[t]he purpose of Congress is the ultimate touchstone in every pre-emption case.” Medtronic, 518 U. S., at 494 (internal quotation marks omitted). It matters not whether the Executive Branch believes that *646 the Government is now capable of handling the burdens of a mandatory system.[11] Congressional intent controls, and Congress has repeatedly decided to keep the E-Verify program voluntary. Because state laws requiring use of E-Verify frustrate the significant policy objectives underlying this decision, thereby imposing explicitly unwanted burdens on the Federal Government, I would hold that federal law impliedly pre-empts the Arizona requirement.
* * *
For these reasons, I cannot agree with either of the Court’s holdings in this case. I respectfully dissent.

 IRCA defines the term “unauthorized alien” to mean, “with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General.” 8 U. S. C. § 1324a(h)(3).

 As these eases demonstrate, a contextual analysis of a statutory provision is in no way “untethered” from the statute’s text. Ante, at 600, n. 6. To the contrary, the majority’s reading of the saving clause — with its singular focus on the undefined word “licensing” to the exclusion of all contextual considerations — is “untethered” from the statute as a whole.

 None of the pre-IRCA state laws cited by the majority provided for licensing-related sanctions. The parties have not identified any preIRCA state laws related to licensing that purported to regulate the employment of unauthorized aliens other than those governing agricultural labor contractors. See ante, at 623-624 (Breyer, J., dissenting).

 By regulation, the Attorney General has conferred on parties charged with violating IRCA the right to obtain discovery from the Federal Government in a hearing before an ALJ. See 28 CFR § 68.18.

 For example, spouses and minor children of persons working in the United States as exchange visitors must apply for employment authorization even though they have lawful immigration status as dependents of the exchange visitor. See 8 CFR §274a.l2(c)(5).

 In its capacity as an employer, a State may be able to access information regarding the work authorization status of its employees through use of E-Verify.

 However, the ‘federal government’s determination creates [only] a rebuttable presumption of the employee’s lawful status.” E. g., § 23-212(H).

 This reading of the saving elause finds support in IRCA’s legislative history. The House Committee on the Judiciary reported that IRCA was “not intended to preempt or prevent lawful state or local processes concerning the suspension, revocation or refusal to reissue a license to any person who has been found to have violated the sanctions provisions in this legislation.” H. R. Rep. No. 99-682, at 58 (emphasis added). The Committee’s reference to “this legislation” is, of course, a reference to IRCA, and only federal officers, ALJs, and courts have authority under IRCA to find that a person has violated the statute’s sanctions provisions.
My reading is also consistent with, though not compelled by, the provisions in IRCA that amended the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), 96 Stat. 2583. As Justice Breyer discusses in detail, see ante, at 623-625 (dissenting opinion), AWPA requires entities to secure a certificate of registration from the Department of Labor before engaging in any “farm labor contracting activity.” AWPA § 101, 96 Stat. 2587, 29 U. S. C. § 1811(a). Before 1986, AWPA prohibited farm labor contractors from hiring unauthorized aliens, and it permitted the Department of Labor to institute administrative proceedings to en *642 force this prohibition. See §§ 103(a)(3), 103(b), 106(a), 96 Stat. 2588-2590. In IRCA, Congress repealed this prohibition, § 101(b)(1)(C), but authorized the Secretary of Labor to withdraw a contractor’s federal registration certificate upon a finding of an IRCA violation, § 101(b)(l)(B)(iii), 100 Stat. 3372, 29 U. S. C. § 1813(a)(6). Thus, IRCA made AWPA’s licensing sanctions turn on a prior federal adjudication of a violation of IRCA.

 Because I believe that the Arizona Aet does not fall within IRCA’s saving clause for this reason, I have no reason to consider the separate question whether the Act’s definition of “license” sweeps too broadly. Compare ante, at 594-597, with ante, at 612-613,621-622 (Breyer, J., dissenting).

 In Williamson v. Mazda Motor of America, Inc., 562 U. S. 323, 335 (2011), we held that the Federal Government’s judgment regarding the cost effectiveness of seatbelt options did not reveal an intent “to forbid common-law tort suits in which a judge or jury might reach a different conclusion.” The obvious distinction between that case and this one is that Congress’ decision to keep use of E-Verify voluntary bears directly on the costs to the Federal Government itself.

 Notably, the Government’s brief does not state that the E-Verify system could accommodate the increased use that would result if all 50 States enacted similar laws; it limits its statement to “the Arizona statute and existing similar laws.” Brief for United States as Amicus Curiae 34 (emphasis added).